Thank you, Judge Clifton. My name is David Ness. I'm with the Federal Defenders of Montana, and I represent the petitioner and the appellant in this case, Mr. Kelly Worthan. As the Court is aware, Mr. Worthan was convicted in the State of Montana of sexual intercourse, incest, and witness tampering. He was subsequently sentenced to a term of 130 years with 60 years suspended. This is a habeas case. And, again, as the Court would be aware, Federal habeas relief may be granted if a State court decision denying relief involves an unreasonable application of clearly established Federal law. The Federal law in this case is the Strickland decision, which requires Mr. Worthan to prove his innocence. Both parties, I'm sure, are in agreement that the clearly established law, as decided by the Supreme Court in this case, is the Strickland decision, which requires Mr. Worthan to prove not only deficient performance, but also prejudice. Both certified issues involve mistakes by his trial counsel. The first ineffective assistance claim alleges the trial counsel failed to adequately assess the qualifications of her expert witness, David Stube. And the second certified issue alleges that she made promises in her opening statement specifically that she would present witness testimony, expert witness testimony, that ended up not being presented. With respect to the first issue, that is, Mr. Stube, or Dr. Stube, as he was thought to have been when he was put on. But he was not, he did not have a Ph.D. He did not have a Ph.D. And he was a liar. It was and I believe the Federal district court termed his testimony to be a disaster. He was a fraud. I mean, there's, you can't put too fine a point on it. But didn't he come really at the suggestion of the defendant himself, the defendant or the appellant? I mean, because it looks like it was a woman, Candy Matthews Jenkins, and someone else who dealt with the appellant, said, oh, here's a good recommended Dr. Stube or Mr. Stube or Stubey? Mr. Stube. I believe it's Stube. Stube. Okay. It's recommended Stube as an expert witness. So didn't the recommendation actually come from the appellant or the defendant himself or his people? There was testimony from defense counsel during the IAC hearing in State Court that this woman, Cathy Matthews Jenkins, had suggested that they hire Mr. Stube. Later on, of course, during the course of trial or maybe shortly afterwards, defense counsel ended up turning this woman in for unauthorized practice of law. And while I think it's certainly a fair reading of the transcript that you're making, Judge Mayhem, that she was suggested by both the Petitioner and this woman, I don't know that that would defeat the claim made here. I understand, but it doesn't weaken it somewhat. Let me pass that. What should Ms. Sadler have done? What should the defendant's trial attorney have done with her expert? Well, I think first and foremost. I mean, if I'm not clear, I go out and hire an expert. And so I say, do you have a Ph.D.? And you're my expert, and you say, sure. I graduated from Harvard, Harvard High School. But you understand what I'm saying? So you answer, am I supposed to conduct an interview? So I should hire a private investigator to investigate my own expert witness, particularly when my own client is the one suggesting the expert? No, Judge. But I think you have to back up to what she did, in fact, know. He had told her that there was a problem with accreditation or something with his Ph.D. But he made it sound like it's the school. You know, during those years, the years that I was there, now everybody got a degree. Everybody got their Ph.D. or degree. Now there's some question about whether they have one or not. I don't know. It's just kind of a big mess. But I've testified before successfully, never been challenged successfully before, right? I mean, he sold himself as a real expert, and she accepted what he said. She – I would just back up to what I think reasonable counsel should do. You're talking to this guy. This guy tells you, oh, there was a problem with the accreditation of my Ph.D. There's problems there. You see on his letterhead he's representing himself as a Ph.D. His signature represents him as a Ph.D. So he said it was accreditation of the school, not accreditation of his Ph.D. Well, it would be the same, though, would it not, Judge Bee? I mean, if the American Bar Association comes along to a law school and says you don't have a big enough library, they're going to take away your accreditation, I don't think that that imperils the J.D.s that have been admitted before that time. No, but this – no, but this, the testimony here, I believe, is that this happened back in 2007. It was unaccredited when he got his degree. I think it was in 2008. So it was an unaccredited school. And my point is, is that when you hear that, and then this expert also goes on to say, oh, I've been challenged before in State court. And remember, this is a small community. It would behoove any lawyer at that point to try to dig in a little further to find out what's going on with this guy. There was no indication that she did that at all. She simply – She accepted what he said. She accepted what he said. And, you know, I think I referenced in my brief, and I don't necessarily – you know, I don't know this defense counsel. I don't necessarily want to throw ethical aspersions at her, but she's letting him testify that he has a Ph.D. when there's indications that he doesn't. And I think that just goes to the reasonableness of ultimately your decision to put this guy on. And as the transcript clearly shows, the prosecutor didn't have any problems digging this stuff up. In fact – I mean, that's the way the – it's the adversary system. So, I mean, wouldn't you agree? I mean, it so often happens that you don't see the weaknesses in your own witness until the government attorney starts cross-examining, and then, uh-oh, there we go. And certainly that happens. But there comes a point, I think, where you cross the line into ineffective performance when that happens, in my point. Okay. You don't have anything specific that she should have done. It's just generally the way she handled it, that there was some question and she should have followed up. Is that your argument based on that? I think specifically, I mean, the resources were there. The prosecutor even had people from the local university lined up to testify about his qualifications. She could have spoken to the lawyers that had attacked his credibility before. There was any number of things she could have done, particularly since her theory of the case and the very thrust of her defense was to try to show that these children were, as she put it, lying or had been coached or their testimony had been unduly suggested, and she testified in the post-conviction hearing that she needed expert to help her, in quotes, Stube, was the best she could do. The district court found that if Worthen had failed to call Stube, based on the record, the jury would have convicted Worthen even if his attorney hadn't put Stube or somebody like that on the stand. That may be the case. Maybe Stube was too. On the prejudice problem of Strickland, right? Let's grant that you're right, that he should have done some checking on Stube or she should have done some checking on Stube. Where's the prejudice? Well, I get where you're going, Judge, and I get where the district court was going with that observation. As I try to say in my reply brief, however, I think that that kind of balkanizes the issues a little too much. I think you need to look at this trial as a whole and back up and look at her. I think silence would have been better than the disaster. She probably should have picked a different theory, and that's not a freestanding claim, but I think it goes to the point. Well, it's enough for us to say she probably should have picked a different theory. We don't know what the theory is. We don't know whether the witness might have been able to testify or whether they would have testified to. The other evidence would have been the same, and it wasn't an insubstantial amount of evidence. So I think the district court did make a point of going on to the prejudice prong, which the Montana court did not, and are we in a position to say that conclusion was incorrect? Why should we say that the finding that there was no prejudice is wrong? Well, I would suggest that at the very least we get a chance to go back to district court and try to establish the facts for prejudice. Shouldn't that have been done already? We never did get a hearing, at least in Federal court. There was a hearing in State court. But the Montana Supreme Court never did make a finding with respect to prejudice. If you go back to court now, these witnesses are going to be, what, 5, 6, 7 years old, 8 years older than they were at the time of the crime. They'll be better witnesses. The children witnesses? I don't know that they'd necessarily be needed if we got a hearing on the ineffective assistance. What can we get a hearing on? I mean, doesn't pinholster mean we don't take new evidence now? This is not a new claim. The IAC claim was raised to the Montana court. The Montana court chose to speak on it at the first prong, not the second, but the claim is exactly the same. So it seems to me the evidentiary record is probably closed, unless you can make some other showing. And so I don't know what it is you'd go back to district court for, except to try to pull together an argument that we're capable of hearing today. Pinholster involved a summary disposition, as I recall. I guess the difference would be that the Montana Supreme Court at least did look at the issues, decide the claim just solely on whether or not there was ineffectiveness, but never did reach the issue of prejudice. So we don't have a state. They specifically determined it. We don't have a state determination. We're not reviewing the determination, but the evidentiary record is closed. So presumably whatever submissions could be made to say that, look, instead of relying upon Dr. or would-be Dr. Stube, there's this John Smith over here with legitimate credentials who has all these powerful things to say that might have made a difference. Right now we're left to speculate that there might be a John Smith who has powerful things to say. And that's not much to give me a basis to conclude there's prejudice. A hearing and or at the least an opportunity for Mr. Werthon to go back to Federal Court with the assistance of counsel, which he didn't have. I wasn't appointed until now. You're playing the cards you're dealt. This isn't a slide or a comment upon what you and your office have done, but the record is what it is at this point. Sure. And I agree with that. Do you want to reserve any time? Yes, Judge. Thank you. May it please the Court. My name is Mike Wellenstein, and I'm an assistant attorney general for the State of Montana. Before I get into the heart of my argument, I'd like to clear up this issue of prejudice. There was a post-conviction hearing in State District Court in which Mr. Werthon was represented by counsel, and the issue of prejudice did come up. And the State District Court post-conviction order is not part of the record here in front of this Court, but in that at that hearing the State District Court found no prejudice. Now, the Montana Supreme Court didn't address that issue because they found that, let's just say, their trial counsel was not deficient. So the issue of prejudice was raised in the State District Court, and Mr. Werthon had his opportunity to show prejudice in there, and according to the State District Court, failed to do so. Now, Werthon is not entitled to any habeas relief under AEDPA. He's failed to show that the Montana Supreme Court's decision denying his ineffective assistance to counsel claim is an unreasonable application of Strickland v. Washington. Now, Werthon is essentially arguing today, as he did in his brief, that the Montana Supreme Court incorrectly applied Strickland v. Washington. He has to do more under AEDPA. He has to show that that decision was an unreasonable application. And I think the problem that Mr. Werthon faces is that Strickland in and of itself gives a lot of deference to trial counsel. So as the Supreme Court has stated, you have this double deference standard that habeas petitioner has to overcome. Mr. Werthon has failed to do so. Kennedy, what is the strategic reason that Walton's counsel failed to do an independent investigation as to Stube's credentials? I think she did do an investigation. The standard is reasonableness. She met with Werthon before trial, reviewed his curriculum vitae, discussed the fact that he had this problem with his accreditation. But Werthon assured her that it all had been worked out and that he had testified as an expert. And, in fact, he did testify as an expert, based upon the fact that he had testified as an expert numerous times in the State district court and that he had the education and experience of doing child assessments and that the State district courts had allowed people with that experience to testify. She didn't need to do any more. She reasonably assumed that the State district court would allow Stube to testify. Now, the State district court correctly decided not to allow him to testify as a psychologist, but he certainly was capable of testifying as a licensed counselor. And there's a strong argument to be made that the district court probably should have allowed her, allowed Stube to testify, and that the question between a psychologist and a licensed counselor goes to more to the weight of the testimony, rather than admissibility as an expert. Now, there's the two ineffective assistance of counsel claims that Werthon raised in the Montana Supreme Court and in the Federal District Court are that Sather failed to ascertain Stube's qualifications that we just discussed and that Sather failed to fulfill her opening State promise to call Dr. Scalati to testify. Now, Werthon, in front of this Court, has expanded those essential two issues, the issues that were exhausted in the Montana Supreme Court and that were raised in the Federal District Court. He's now in his brief arguing that Sather was ineffective for failing to present the testimony of Dr. Stube. Well, that's not an issue that was raised in front of the Montana Supreme Court. Roberts. For Scalati. Yeah. Well, Scalati, the Scalati issue was, but he's also the other issue was that Dr. Scalati was ineffective for failing to present the testimony of Dr. Stube. She did produce the evidence of Dr. --"would be Dr. Stube." That was a disaster. She didn't call Dr. Scalati. She didn't call Dr. Scalati. And the Montana Supreme Court addressed that issue. And the Montana Supreme Court didn't decide whether Sather was prejudiced or whether Sather's performance was deficient. The Court went right to the prejudice prong. And the Montana Supreme Court's decision that Werthon was not prejudiced by Sather's unfulfilled promise to call Dr. Scalati was not an unreasonable decision. In addressing whether the prejudice prong under Strickland was satisfied, the Montana Supreme Court naturally looked to the premise that Sather made an open statement. And the Court looked at that promise and said it's a rather generic promise and much different than the dramatic promises that other courts have found to be prejudicial under Strickland. The Montana Supreme Court, in analyzing the issue, also looked at the fact of the time difference between the promise made in the opening statement and when it went to the jury. It was like six days. And that six days, according to the Montana Supreme Court, diluted some of the possible impact from that promise. It's more than likely the jury probably forgot whatever the promise was after six days. The Montana Supreme Court, in analyzing the prejudice issue, also correctly looked at the fact that the prosecutor in his closing argument never mentioned the unfulfilled promise, never even mentioned Dr. Scalati's testimony. And finally, as far as this issue is concerned, and the Montana Supreme Court looked at this, and so did the State district court and the Federal district court, they looked at it, they looked at the possible testimony that Scalati could have provided. And that he did provide testimony at the sentencing. At the sentencing hearing, he did provide it. And it was not very helpful. It was not very good. Interestingly enough, Worthen had different counsel at sentencing than he had during trial, and so this new counsel presented the sentencing testimony. And that testimony, according to all the courts, was pretty damning towards Mr. Worthen. And that included things like Scalati testified it was rare for two children of this age to make a false allegation of sexual abuse, and it was rare for two children to make a false allegation. He also talked about the fact that the children, it was almost, the children described ejaculate from the defendant, and Dr. Scalati testified it was almost impossible for children of this age to accurately describe that without actually experiencing the substance. And Dr. Scalati also looked at the fact that Olivia, the older girl's disclosure to her teacher was consistent with an actual abuse victim. And another kicker is that Dr. Scalati testified that Dr. Miller, who conducted the forensic interviews of the children, Dr. Scalati testified that he did that, Dr. Miller did those interviews in a proper fashion. One of the important facts the Court must consider when addressing this, when addressing defendants' overall claim that the children were fabricating their testimony or that they were coached or that they were somehow led into these abuse allegations and that counsel made mistakes in not producing this testimony, is the fact that the children, when they first made their disclosures, they made, Olivia made her disclosure to a friend and her friend's mom. There was no leading questions during that disclosure. There was no coaching. There was no suggestibility. Olivia also then at about the same time made an emotional disclosure to her teacher in the hallway after kids were teasing her at school. Again, no leading questions, no suggestibility, no coaching. If this Court determines that Saylor was prejudiced, I mean, Saylor's performance was deficient in any of these types of claims, it comes out that this Court should not be prejudiced. The evidence strongly shows that Mr. Worthen committed these offenses and that Saylor's neglecting, no matter how you count it, and putting on this expert testimony would not change the outcome because of the initial disclosures made by Olivia to her teacher and to her friend. If there is no further questions, I ask the Court to affirm the Federal District Court's order. Thank you. Thank you for your argument. Mr. Nass. Nass. I guess just very briefly, I think Judge B, at the beginning of counsel's argument, you kind of hit the head on the ñ hit the nail on the head. There was and could not be any strategic reason, I don't think, for not further investigating Stubbs' qualifications. It was, I think, everyone would have to concede a mistake, an error. It probably should have been done. The two cases that I think are probably most on point from the Supreme Court, and they're not cited in either of the briefs, but are from Pellevey Beard and Wiggins v. Smith. They're both capital cases, but they both dealt with counsel investigating a little bit, but ultimately not investigating enough. And the Supreme Court found ineffective assistance at counsel in those cases. And then just one other thing. The district court, the Federal District Court indicated that Mr. Werthon in his pro se 2254 petition was changing around his claims with regard to the promises in the opening statement. And, you know, I read that a number of times, and I was trying as well as I read that together with the opening brief filed in the Montana Supreme Court on post-conviction. And I guess I just don't quite understand where the district court is going in that. The district court determined that on post-conviction, Werthon argued that Sather was ineffective because she knew Dr. Scalati's testimony might be inadmissible, but nevertheless recklessly promised the jury she would call them. The statement of issues in the opening brief filed in the Montana Supreme Court states whether the district court erred in determining trial counsel's act of promising in opening statements, the jury would hear testimony from Dr. Scalati when he ultimately did not testify. Well, the focus there is on making a promise that wasn't kept, that is, Dr. Scalati will testify and that never happened. The focus in the district court's discussion appears to be not on the unfulfilled promise, but on what additional testimony might have been brought by Dr. Scalati, that is, assume the testimony had gotten in. Same problem, but a different ramification or aspect. And, I mean, it could be the Montana Supreme Court had both ramifications in front of it and elected only to talk about the unfulfilled promise, but it is a different ill effect that's being argued or focused on in the district court. It's a – I guess it's a subtlety, as my argument is, is that I think that both the arguments the district court talks about were discussed on post-conviction. That's my only point. Okay. Thank you. Thank you. We thank both counsel for your arguments. The case just argued is submitted.
judges: Mahan, Clifton, Bea